NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| **CHRISTOPHER CHEMI, Individually and on Behalf of All Others Similarly Situated,** | : : : : | **FINAL APPROVAL OF CLASS SETTLEMENT** |
| Plaintiffs, | : : | **OPINION** |
| v. | : : | 2:05-cv-1238 (WHW) |
| **CHAMPION MORTGAGE, KEYBANK NATIONAL ASSOCIATION AND KEYCORP** | : : : | |
| Defendants. | : : | |

**Walls, Senior District Judge**

**THIS MATTER** comes before the Court upon the motion of Christopher Chemi, Brian Gagliardi, Mary Intile, Michael Lauretti, Stefan Libert, David Crockett and Scott Moody individually and on behalf of the classes they represent and on behalf of all mortgage agents similarly situated (collectively "Plaintiffs") for an Order Certifying the Settlement Classes, Granting Incentive Awards to the named Plaintiffs, Granting Attorney's Fees to Plaintiffs' Counsel and Granting Final Approval of the Stipulation and Settlement Agreement between Plaintiffs and Defendants Champion Mortgage, Keybank National Association, and Keycorp. The Court grants Plaintiffs' motions.

### FACTS AND PROCEDURAL BACKGROUND

Plaintiff Chemi filed his initial complaint on March 1, 2005, pursuant to the Fair Labor Standards Act of 1938 (the "FLSA"), 29 U.S.C. § 216(b), as a nationwide collective action to

NOT FOR PUBLICATION

recover unpaid overtime compensation and related expenses allegedly owed to him and all other

loan officer employees of Defendants.  Plaintiffs and Defendants jointly moved for preliminary

approval of class settlement on October 24, 2007, but the Court denied their motion on

December 20, 2007.  On January 24, 2008, Plaintiffs filed a renewed motion for preliminary

approval of class settlement. On April 17, 2008, the Court sent counsel for all parties a letter with

comments regarding certain amendments to the settlement agreement that the Court believed

were necessary to enable preliminary approval. On June 24, 2008, the parties submitted a

renegotiated settlement agreement ("Settlement"). The Court granted preliminary approval of the

settlement agreement on July 31, 2008 with instructions to begin the process of notifying

members of the class. On March 17, 2009, a final approval hearing was held where Plaintiffs'

presented the results of the class notification process. No objections to final approval were raised

by Defendants or any class members.

**A. Settlement Agreement**

      The settlement agreement ("Settlement") defines the settlement class ("Class") as:

> All individuals who were employed as a Champion Loan Officer at any time from
> March 1, 2002 through February 28. 2007.

For purposes of the Settlement and the full and final resolution of the litigation, the parties

stipulate to the certification of that Class under Fed. R. Civ. P. 23(b)(3) and 29 U.S.C. § 216(b).

Defendants have agreed to pay the Class a maximum total settlement of $1.2 million.[1]  Of this

_____

    [1]  This settlement amount was determined in the following manner.  Based upon
discovery, Plaintiffs estimated that loan officer employees of Defendants worked, on average, 7.5
overtime hours per two-week pay period.  Using Class members' rates of pay, liquidated
damages were determined by multiplying total unpaid wages by 2, yielding potential damages of

**NOT FOR PUBLICATION**

amount, the parties have agreed to allocate $250,000.00 for attorneys' fees and costs

(approximately 20.83% of the total settlement), leaving $950,000.00 for payment to the Class.

Plaintiffs also petition the Court for the payment of incentive awards to named Plaintiffs (i.e.,

$5,000.00 to Chemi, $3,000.00 each to Gagliardi and Intile, $2,000.00 to Libert, and $1,000.00

each to Lauretti, Moody, and Crockett).

Each Class member will receive a settlement payment which will be calculated by

allocating to each of them a Share of the settlement, pursuant to a formula based on length of

employment and regular rate of pay.  In accordance with this Court's recommendation in its

April 17, 2008 letter, the parties reorganized the Settlement to divide each Class Member's claim

into two parts, each representing 50% of the Class Member's Share. The first part is each Class

Member's Share under the consolidated state actions incorporated into the Settlement. All Class

Member were deemed members of this claim unless they opted out. The second part of each

Class Member's Share is their claim under the FLSA action incorporated into the Settlement. In

order to receive this portion of their Share, each Class Member was required to sign and return a

FLSA opt-in form ("Claim Form").

**B. Notification of the Class**

All Claim Forms and notices regarding the proposed settlement and pending class action

were mailed by the claims administrator by August 20, 2008. According to Plaintiffs, 917

persons were mailed notices and claims forms using addresses provided by the Defendants. Of

---

$4,801,010.73.  The settlement amount was then reduced during settlement negotiations based
upon a series of factors, including likelihood of success and cost of litigation.

**NOT FOR PUBLICATION**

these 917 members, Plaintiffs inform the Court that 405 have opted-in to the FLSA settlement

class. Opt-out notices and objections to the Settlement were required to be returned by November

17, 2008 and December 17, 2008, respectively. At the final approval hearing, Plaintiffs informed

the court that no Class Member's had objected and only one member had opted-out.

Shares of Class members who did not timely submit Claim Forms will be allocated to a

residual fund. The money from the residual fund will be used, first, to pay the incentive

payments to named Plaintiffs and, then, to pay the administrative fees of the claim administrator

in an amount not to exceed $10,000.00. If the residual fund is insufficient to cover the incentive

awards or administrative fees, these expenses will be deducted from Class counsel's attorneys'

fees. If, after these expenses, money remains in the residual fund, however, it will be distributed

to each Class member as a Supplemental Share in the following manner:

1. Each Class member's Share will be divided by the total Shares for all
   Class members, in order to determine each Class member's respective
   percentage of the total Shares; and

2. That percentage will then be multiplied by the total Shares remaining in
   the residual fund, yielding each Class member's Supplemental Share.

Each Class member will receive a settlement payment in the amount of his Share plus his

Supplemental Share.

## STANDARDS

**A. Class Certification**

Fed. R. Civ. P. 23(e)(2) states the following:

The claims, issues, or defenses of a certified class may be settled, voluntarily
dismissed, or compromised only with the court's approval. The following
procedures apply to a proposed settlement, voluntary dismissal, or compromise:

**NOT FOR PUBLICATION**

\*\*\*

> If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

The Third Circuit has identified nine factors that bear on the fairness, reasonableness and adequacy of a settlement agreement:

> (1) [T]he complexity and duration of the ligation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation.

In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 785-86 (3d Cir. 1995) (citing Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975)).

When certifying a settlement class, courts must follow the general requirements of Rule 23 and, therefore, "a settlement class must satisfy the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation and the Rule 23(b) requirements." Prudential I, 962 F. Supp. at 508. Additionally, where, as here, a settlement class is sought to be certified under Rule 23(b)(3), the class must satisfy the Rule's superiority and predominance requirements.

**B. Attorney's Fees**

The Third Circuit has established two methods for evaluating the award of attorneys' fees: (1) the lodestar approach, and (2) the percentage of the recovery approach. General Motors, 55 F.3d at 820-21; Prudential II, 148 F.3d at 333. The Third Circuit has emphasized that "[t]he percentage of recovery method is generally favored in common fund cases because it allows

NOT FOR PUBLICATION

courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it

for failure.'" In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005) (quoting

Prudential II, 148 F.3d at 333).

In Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 (3d Cir. 2000), the Third

Circuit set forth with specificity the factors that a court should consider in evaluating attorneys'

fees:

> (1) the size of the fund created and the number of persons benefitted; (2) the
>
> presence or absence of substantial objections by members of the class to the
>
> settlement terms and/or fees requested by counsel; (3) the skill and efficiency of
>
> the attorneys involved; (4) the complexity and duration of the litigation; (5) the
>
> risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs'
>
> counsel; and (7) the awards in similar cases. Gunter, 223 F.3d at 195 n.1.

these factors regarding final approval of the Settlement, class certification and attorney's fees are

considered in detail.

## DISCUSSION

### A. Final Approval of the Settlement

To determine whether Plaintiffs request for final approval of the Settlement should be

granted, the Court must consider the 9 General Motors factors.

I. The complexity and duration of the ligation

**NOT FOR PUBLICATION**

This factor is "intended to capture 'the probable costs, in both time and money, of

continued litigation.'" General Motors, 55 F.3d at 811. The Court must compare the

Settlement to the time and expense of achieving a potentially more favorable result through

further litigation. Where the complexity, expense and likely duration of litigation are significant,

a Court should view this factor as weighing in favor of settlement. In re The Prudential Insurance

Co. of America Sales Practices Litig. ("Prudential I"), 962 F. Supp. 450, 536 (D.N.J. 1997).

Due to the multi-jurisdictional nature of this dispute there is little doubt that litigation of

each individual class member's claims would be complex and costly. Each claim would require

significant time for both motions practice and trial. It is also likely that additional time for

appeals would also be required. The Settlement, however, provides substantial and immediate

benefits for the Class, undiminished by further expenses and without the risk and uncertainty of

continued litigation. This factor weighs in favor of approving the Settlement.

II.  The reaction of the class to the settlement

This factor instructs the Court to look to the reaction of the class to the settlement in

determining whether to grant final approval. See In re Cendant Corp. Litig., 264 F.3d 201, 231-

32 (3d Cir. 2001). A largely positive reaction from the class is persuasive evidence of the fairness

and adequacy of the Settlement. See In re Prudential Insurance Co. America Sales Practice Agent

Actions ("Prudential II"), 148 F.3d 283, 318 (3d Cir. 1998) (affirming conclusion that class

reaction was favorable where 19,000 policyholders out of 8 million opted out and 300 objected).

**NOT FOR PUBLICATION**

Plaintiff's report in their brief that 405 of the 917 Class Members have opted into the

FLSA settlement and that only one member has opted out of the state law settlement. No

objections to the Settlement have been received. Plaintiffs argue that the "utter absence of

objections from the class itself militates strongly in favor of approval of the Settlement." Sala v.

National R. Passenger Corp., 721 F. Supp. 80, 83 (E.D. Pa. 1989) see also In re Cendant, 264

F.3d at 231-32. The Court agrees with Plaintiffs and finds that the lack of objections and single

opt-out weigh in favor of final approval of the Settlement.

III. The stage of the proceedings

This factor requires the Court to examine the level of case development that transpired

prior to settlement. The aim of this factor, therefore, is to ensure that class counsel has an

"adequate appreciation of the merits of the case before negotiating" a settlement. Prudential II,

148 F.3d at 319 (quoting General Motors, 55 F.3d at 813).

Plaintiffs argue that they have already conducted a considerable amount of discovery in

this case, including depositions of key witnesses and the review of documentary evidence. The

parties have also conducted lengthy negotiation and renegotiation of the Settlement. In light of

this considerable investigation and negotiation, the Court finds that all parties have an "adequate

appreciation of the merits of the case."

IV. The risks of establishing liability and damages

The fourth and fifth General Motors factors consider the risk of establishing liability at

trial in order to balance the parties' relative likelihood of success against the immediate benefits

**NOT FOR PUBLICATION**

derived from a settlement. See Prudential II, 148 F.3d at 319. Additionally, these factors

"attempt[ ] to measure the expected value of litigating the action rather than settling it at the

current time." In re Cendant, 264 F.3d at 239. To the extent that establishing damages is

contingent upon liability, many of the same risks will be present in each analysis.

Here, Plaintiffs face the initial hurdle of proving Defendants' liability under both FLSA

and state wage and hour laws. The Settlement terms do not include any admission of liability by

Defendants. If this matter were to proceed to trial, it is likely that Defendants would present

numerous affirmative defenses regarding the Class Members claims to uncompensated overtime

pay. The lack of documentation regarding overtime hours also creates a significant risk that

Plaintiffs' assumptions in regards to uncompensated overtime would be vehemently questioned

by Defendants. Weighing these risks of litigation against the definite and immediate resolution of

these claims through the Settlement, the Court concludes that litigation is unlikely to produce any

additional "value" to the Class Members.

V. The risks of maintaining a class action

"[T]he prospects for obtaining certification have a great impact on the range of recovery

one can expect to reap from the [class] action, this factor measures the likelihood of obtaining

and keeping a class certification if the action were to proceed at trial." Warfarin, 391 F.3d at 537.

This factor is relevant since the Court has thus far only approved *preliminary* certification of the

Class.

NOT FOR PUBLICATION

Plaintiffs argue that although they are confident they could obtain and maintain class certification throughout litigation of this case, there are significant risks that de-certification could occur. Plaintiffs first point to the fact that Defendants "could challenge both the Rule 23 class certification and the FLSA collective certification." (Pls' Brief at 15). Plaintiffs' also note that "because of prior rulings... the law could change insofar as the perception of a potential conflict... between the opt-in... and opt-out procedures." (Id.).

Plaintiffs' first argument regarding a possible challenge by Defendants to certification is persuasive since considerable negotiation regarding the scope of the Class has already occurred, suggesting that certification would be hotly contested if this matter were to proceed to further litigation. However, Plaintiffs' second argument regarding the prospect of decertification due to a change in the law of this Circuit is entirely speculative. In sum, there is a risk that obtaining certification may be unsuccessful but minimal risk that, once obtained, decertification would occur. Viewed together, these risks weigh slightly in favor of final approval.

VI. The ability of the defendants to withstand a greater judgment

This factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement." In re Cendant, 264 F.3d at 240. There has been no evidence presented to this Court regarding Defendants ability to pay. However, as Plaintiffs point out, there is considerable financial turmoil in the mortgage industry, creating some doubt about Defendants ability to withstand a larger judgement in the future. Defendants inability to withstand a greater judgement is speculative at best. This factor neither supports nor erodes final

**NOT FOR PUBLICATION**

approval of the Settlement. See In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 538 (3d.

Cir. 2004).

> VII. The range of reasonableness of the settlement in light of the best recovery and all the
> attendant risks of litigation

The last two General Motors factors ask whether the settlement is reasonable in light of

the best possible recovery and the risks the parties would face if the case went to trial. These

factors examine "whether the settlement represents a good value for a weak case or a poor value

for a strong case." Warfarin, 391 F.3d at 538.

Plaintiffs estimate that the Settlement amount is "estimated at 50% of possible recover."

(Pls' Brief at 17). While this is significantly less than the "best recovery" the Class could obtain

if this matter were to continue to trial, it is not such a significant difference that this Court should

bar approval of the Settlement. See Officers for Justice v. Civil Service Comm'n, 688 F.2d 615,

628 (9th Cir. 1982) ("there is no reason, at least in theory, why a satisfactory settlement could not

amount to a hundredth or even a thousandth part of a single percent of the potential recovery").

Given the magnitude of the risks in litigation discussed above, the Settlement represents a fair

and adequate recovery.

In summary, the majority of the General Motors factors weigh in favor of approving the

Settlement.

**B. Class Certification**

The Court has up until now only approved a preliminary certification of the Class for the

**NOT FOR PUBLICATION**

purposes of settlement negotiations. The parties now seek final approval of the Class as defined

in the Settlement. The Class is divided into two parts, the first being the class of members

seeking compensation under the consolidated state wage and hour claims and the second being

the class of members seeking compensation under FLSA. The state claims class ("State Class") is

subject to the requirements of Federal Rule of Civil Procedure 23. The FLSA claims class

("Federal Class") is subject to the collective action requirements in 29 U.S.C. § 216(b). Each set

of requirements is considered in detail below.

     I. <u>The State Class</u>

Rule 23 of the Federal Rules of Civil Procedure allows this Court to certify a class for

settlement purposes only. <u>Prudential I</u>, 962 F. Supp. 450, 508 (D.N.J. 1997). A settlement class is

"a device whereby the court postpones the formal certification procedure until the parties have

successfully negotiated a settlement, thus allowing a defendant to explore settlement without

conceding any of its arguments against certification." <u>General Motors</u>, 55 F.3d 768, 786 (3d Cir.

1995). When certifying a settlement class, courts must follow the general requirements of Rule

23 and, therefore, "a settlement class must satisfy the Rule 23(a) requirements of numerosity,

commonality, typicality, and adequacy of representation and the Rule 23(b) requirements."

<u>Prudential I</u>, 962 F. Supp. at 508. Additionally, where, as here, a settlement class is sought to be

certified under Rule 23(b)(3), the class must satisfy the Rule's superiority and predominance

requirements.

     I. *Numerosity*

-12-

**NOT FOR PUBLICATION**

Rule 23(a)(1) provides that a class action may be maintained only if "the class is so numerous that joinder of all members is impracticable." The numerosity requirement of Rule 23(b)(1) does not require joinder to be impossible. "To meet the numerosity requirement, class representatives must demonstrate only that 'common sense' suggests that it would be difficult or inconvenient to join all class members." Prudential I, 962 F. Supp. at 510 (citing Lerch v. Citizens First Bancorp, Inc., 144 F.R.D. 247, 250 (D.N.J. 1992)).

When dealing with a class that numbers in the hundreds, joinder will most often be impracticable. See Newberg on Class Actions (4th Ed. 2007) § 305 (class of 40 or more raises presumption that numerosity requirement met). The State Class contains over 900 members. In light of the significant class size, the Court finds that Rule 23(a)(1) is satisfied.

ii. *Commonality and Predominance*

Rule 23(a)(2) requires there be "questions of law or fact common to the class." Rule 23(b)(3) requires that these common issues of law or fact "predominate over any questions affecting only individual members." The predominance requirement of Rule 23(b)(3) is a more exacting standard and, therefore, incorporates the Rule 23(a) commonality analysis. See Warfarin, 391 F.3d 516, 528 (3d. Cir. 2004). Accordingly, the two factors are commonly considered together. See Id.; see also In re LifeUSA Holding, Inc., 242 F.3d 136, 144 (3d. Cir. 2001); Prudential I, 962 F. Supp. at 510.

The commonality requirement of Rule 23(a)(2) is satisfied if there is at least one question

-13-

**NOT FOR PUBLICATION**

of fact or law common to the class. See In re Baby Neal, 43 F.3d 48, 56 (3d Cir. 1994). Here, the

commonality requirement is met because the state claims asserted with respect to Champion

Mortgage's overtime compensation policy present common operative facts and common

questions of law.

  For the class to be certified under Rule 23(b)(3), which the parties are seeking here, this

Court must also find that these common questions predominate over individual issues. "To

evaluate predominance, the Court must determine whether the efficiencies gained by class

resolution of the common issues are outweighed by individual issues presented for adjudication."

Prudential I, 962 F. Supp. at 510-11. At the core of this settlement is Champion Mortgage's

belief that its mortgage agents did not qualify for overtime compensation. Each State Class

member shares a similar legal question: whether the alleged failure to pay mortgage agents for

overtime is a violation of applicable state wage laws. This common question shared by class

members predominate over any factual variations regarding individual mortgage agent's claims,

such as the number of hours worked or the hourly wage. These individual issues affect only the

mortgage agent's potential damages, but not the nature or legal basis of the State Class claims.

See Prudential I, 962 F. Supp. at 517 ("Individual damages issues do not defeat an otherwise

valid class certification attempt"); see also Baby Neal, 43 F.3d at 57.

  Similarly, variations between the wage and hour laws of different states are not sufficient

to defeat predominance for the State Class. See Warfarin, 391 F.3d at 529-30; Prudential II, 148

**NOT FOR PUBLICATION**

F.3d at 313-315. Certification of litigation classes with claims arising under the laws of several

states requires a court to determine whether such state law variations render class action litigation

unmanageable. See In re Sch. Asbestos Litig., 789 F.2d 996, 1010 (3d Cir. 1986). These

concerns of case manageability, however, are not present in the context of a class being certified

for settlement purposes only. See Warfarin, 391 F.3d at 529 ("when dealing with variations in

state laws, the same concerns with regards to case manageability that arise with litigation classes

are not present with settlement classes"); Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 620

(1997). Here, since the class is not being certified for litigation purposes, predominance is not

defeated by variations in state laws.

　　　　　iii. *Typicality*

　　　Rule 23 also requires that "the claims or defenses of the representative parties are typical

of the claims or defenses of the class." FRCP 23(a)(3). "Typicality lies where there is

a strong similarity of legal theories or where the claims fo the class representatives and class

members arise from the same alleged course of conduct by the defendant." Prudential I, 962 F.

Supp. at 518 (citations omitted). Even where there may be factual differences between the

claims of the class representatives and other class members, it does not rule out a finding of

typicality. In re Lucent Technologies, Inc., Sec. Litig., 307 F. Supp. 2d 633, 640 (D.N.J. 2004)

(citing Prudential II, 148 F.3d at 310). Here, the same allegedly unlawful conduct affected both

**NOT FOR PUBLICATION**

the named Plaintiffs and the putative class members, all of whom are former mortgage agents at Champion Mortgage. Both the named Plaintiffs and the State Class members have alleged that Champion Mortgage's failure to compensate mortgage agents for overtime work violated the applicable state wage and hour laws. This Court finds that the typicality requirement of Rule 23(a)(3) is also satisfied.

     iv. *Adequacy of Representation*

   Rule 23(a)(4) requires that the "representative parties fairly and adequately represent the interests of the class." F.R.C.P. 23(a)(4). To determine whether a class is adequately represented, courts look to two factors: "(1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to those of the class." Prudential I, 962 F. Supp. at 519. Those standards are met here.

   Named Plaintiffs and their counsel have prosecuted this action vigorously on behalf of the class. According to their resumes, Plaintiffs' counsel are experienced in this subject matter and have prosecuted a number of class action lawsuits in the employment and overtime wage context. (Pls' Brief Ex. A). Furthermore, under the proposed settlement, all class members who submitted timely claims, including the named Plaintiffs, will receive a pro-rata portion of the settlement fund based upon estimations of their wage and hours worked. As such, there appears to be no conflict of interest in the settlement allocations. The Court is satisfied that the Rule 23(a)(4) adequate representation requirement is met.

NOT FOR PUBLICATION

v. *Superiority*

Rule 23(b)(3) requires that "a class action [be] superior to other available methods for the

fair and efficient adjudication of the controversy." The Rule provides the Court with four

nonexclusive factors to aid in this determination: (1) the interest of members of the class in

individually controlling the litigation of separate claims; (2) the extent to which litigation

concerning the current controversy had already been commenced by members of the class; (3) the

desirability of concentrating claims in a given forum; and (4) difficulties in management of the

litigation if pursued as a class action. FRCP 23(b)(3)(A)-(D).

In this case, a settlement of the class action is the superior method for litigation of the

State Class claims. The size and scope of the State Class weighs in favor of class certification.

"As the case becomes larger and more geographically dispersed, the traditional alternatives of

joinder, consolidation, and intervention will be impracticable." Prudential I, 962 F. Supp. at 523

(citing Newberg § 4.33, at 4-136 to 4-137). The State Class includes mortgage agents in five

different states making traditional methods of joinder and consolidation impracticable.

Additionally, the amount of recovery that each State Class member will receive is relatively

modest, leaving individual class members with minimal incentive and little ability to litigate their

claims against Champion Mortgage independently. The alternative to class action litigation is for

individual mortgage agents to bring multiple, individual lawsuits for their small amount of

damages. This alternative would be uneconomical for potential individual plaintiffs as litigation

costs could dwarf any potential recovery. Here, a class action would facilitate the spreading of

**NOT FOR PUBLICATION**

litigation costs among Plaintiffs. See Prudential II, 148 F.3d at 315-16. Moreover, the few State

Class members who have commenced their own actions have agreed to consolidate their claims

into the Settlement and join this action as named Plaintiffs.

In the context of a settlement class action, concerns regarding litigation management and

the desirability of concentrating the litigation in a particular forum are insignificant. See

Amchem, 521 U.S. at 620 (stating that when confronted with a settlement-only class

certification, a district court need not be concerned with issues of manageability if the case went

to trial, because the point of the settlement is that there will be no trial.) Considering the

difficulty individual mortgage agents would suffer if forced to bring individual state claims, the

Court finds that "the class action is not only the superior method for adjudicating

this controversy, it affords the vast majority of class members the only practical avenue of

redress." Prudential I, 962 F. Supp. at 522.

In summary, certification of the State Class for the Settlement is the superior choice for

all class members since common issues and facts predominate and it would be impracticable for

individual members to pursue their own claims. We now turn to the certification of the Federal

Class as a collective action under the FLSA.

II. The Federal Class

The Federal Class raises only FLSA claims and has already been conditionally certified as

a collective action pursuant to 29 U.S.C. § 216(b). Section 216(b) of the FLSA, states that "an

action. . . may be maintained [under the FLSA]. . . by any one or more employees for and in

**NOT FOR PUBLICATION**

behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b)

(1982). Unlike the class action requirements under Rule 23, § 216(b) requires class members to

"opt-in" by affirmatively indicating their consent to be part of the class. See Sperling v.

Hoffman-La Roche, Inc., 862 F.2d 439, 444 (3d Cir. 1988). Section 216(b) mandates that "[n]o

employee shall be a party plaintiff to any such action [under the FLSA] unless he gives consent

in writing to become such a party and such consent is filed in the court in which such action is

brought." 29 U.S.C. § 216(b).

Under § 216(b), there are two threshold requirements for an action to proceed as a

collective action: (1) class members must be "similarly situated" and (2) all members must

affirmatively consent to join the action. Id. The FLSA does not define "similarly situated" and

neither the Third Circuit nor the Supreme Court have expounded a test for making such a

determination. In the absence of such guidance, district courts have established a two-tier test to

determine who are "similarly situated' employees under § 216(b). See Morisky v. PSE&G Co.,

111 F. Supp. 2d 493, 497 (D.N.J. 2000); Moeck v. Gray Supply Corp., 2006 WL 42368, * 4

(D.N.J. 2006); Bayles v. American Med. Response of Colorado, Inc., 950 F. Supp. 1053, 1066-

67 (D.Colo. 1997). A court first makes a determination during the "notice stage" – which this

Court already made – in response to Plaintiffs' motion for preliminary approval of the

Settlement. See Morisky, 111 F. Supp. 2d at 497. The determination at preliminary stage

involves a lenient standard and generally results in "conditional certification" of a class. Id.

NOT FOR PUBLICATION

Later, after discovery is largely complete and the case is ready for trial the court will

make a second determination. Morisky, 111 F. Supp. 2d at 497. At this stage the court will have

more information on which to base its decision and, therefore, will employ a stricter standard. Id.

If, under the more stringent standard, the court determines that plaintiffs are similarly situated,

the case will proceed as a collective action. Id.

There has been no objection filed to this Court's "conditional certification" of the Federal

Class or any other change to suggest that Federal Class members are no longer "similarly

situated." The Federal Class members are all former mortgage agent's asserting claims regarding

Champion Mortgage's failure to provide overtime wages as required by the FLSA. The Court

finds that the 917 Federal Class members remain similarly situated and certifies this action as a

collective action under § 216(b).

## C. Attorney's Fees

Plaintiffs' also request final approval of the $250,000.00 attorney's fees/costs negotiated

under the Settlement. Plaintiffs' counsel argues that these fees are "extremely modest" and

amount to less than 21% of the "gross Class settlement fund." (Pls' Brief at 18). The request for

attorney's fees is unopposed.

I. Attorneys' Fees

The Third Circuit has established two methods for evaluating the award of attorneys'

fees: (1) the lodestar approach, and (2) the percentage of the recovery approach. General Motors,

**NOT FOR PUBLICATION**

55 F.3d at 820-21; Prudential II, 148 F.3d at 333. The Third Circuit has emphasized that "[t]he

percentage of recovery method is generally favored in common fund cases because it allows

courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it

for failure.'" In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005) (quoting

Prudential II, 148 F.3d at 333). The Court finds that the percentage of fund method is the proper

method for compensating Plaintiffs' counsel in this common fund case.

    In Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 (3d Cir. 2000), the Third

Circuit set forth with specificity the factors that a court should consider in evaluating attorneys'

fees under the percentage of fund method. The Gunter factors include:

> (1) the size of the fund created and the number of persons benefitted; (2) the
> presence or absence of substantial objections by members of the class to the
> settlement terms and/or fees requested by counsel; (3) the skill and efficiency of
> the attorneys involved; (4) the complexity and duration of the litigation; (5) the
> risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs'
> counsel; and (7) the awards in similar cases.

Gunter, 223 F.3d at 195 n.1. In Gunter, the Circuit also directed District Courts to "cross-check

the percentage award at which [it] arrive[s] against the 'lodestar' award method,

which is normally employed in statutory fee-award cases." Id. The Third Circuit has noted three

additional factors that may be considered when analyzing the propriety of an attorneys' fees

award, namely (1) the value of benefits accruing to class members attributable to the efforts of

class counsel as opposed to the efforts of other groups, such as government agencies conducting

investigations; (2) the percentage fee that would have been negotiated had the case been subject

-21-

**NOT FOR PUBLICATION**

to a private contingent fee agreement at the time counsel was retained; and (3) any "innovative"

terms of settlement. In re AT&T Corp., 455 F.3d at 164. (citing Prudential II, 148 F.3d at 338-

40). Although the analysis of the aforementioned seven factors may somewhat overlap with the

factors considered under the General Motors test to examine the appropriateness of the

Settlement, this Court will nonetheless consider each factor in turn.

I. *The size of the fund created and the number of persons benefitted*

"As a general rule, as the size of a fund increases, the appropriate percentage to be

awarded to counsel decreases." In re Cendant, 232 F. Supp. 2d at 337. This rule is based on the

premise that, "in many instances[,] the increase in recovery is merely a factor of the size of the

class and has no direct relationship to the efforts of counsel." Id. (quoting Prudential II, 148 F.3d

at 339).

Plaintiffs argue that their fees, which constitute 21% of the Settlement, are reasonable in

light of awards of 25% to 30% in what they term "mega fund" cases. (Pls' Atty. Brief at 4)

(citing In re Rite Aid, 396 F.3d at 298). While the current matter does not qualify as a "very large

settlement" it is still significant that Plaintiffs have secured $1.2 million for the 917 class

members. See In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 737 n.19 (3d Cir. 2001)

(recognizing $100,000,000 as the marker of a very large settlement). It is also significant that

counsel has secured this settlement in the face of considerable litigation challenges surrounding

certification of the class and estimation of unpaid overtime hours. This factors weighs in favor of

Plaintiffs' request for attorney's fees.

-22-

**NOT FOR PUBLICATION**

> ii. *The presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel*

As noted, there are no objections to the Settlement by any of the State or Federal Class members. This absence of objections weighs in favor of Plaintiffs' request.

> iii. *The skill and efficiency of the attorneys involved*

The skill and efficiency of the attorneys involved is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 16, 194 (E.D.Pa. 2000). Here, Plaintiffs' counsel includes attorneys with significant employment law and class action experience. (Resumes, Pls' Brief Ex.A). The settlement entered with Defendants is a reflection of Plaintiffs' counsel's skill and experience. See Warfarin, 212 F.R.D. at 261 (class counsel "showed their effectiveness through the favorable cash settlement they were able to obtain"). The only indication of inefficiency was the fact that Plaintiffs required three motions for preliminary certification and four amended complaints before finally presenting the Court with an acceptable settlement agreement. However, this lengthy process was likely the result of the difficulty of consolidating the various state claims and not a reflection of Plaintiffs' counsel's lack of skill. This factor weighs in favor, although only slightly, of the Plaintiffs' request.

> iv. *The complexity and duration of the litigation*

-23-

**NOT FOR PUBLICATION**

As discussed above, if this case were to proceed to trial Plaintiffs would have to contend with many complex legal issues such as certification of the class, classification of Plaintiffs under the applicable state labor laws and the estimation of the amount of unpaid overtime hours. The complexity of the issues involved in this case supports approval of the attorneys' fees award.

v. *The risk of nonpayment by Defendants*

Plaintiffs again raise the specter of financial difficulties in the mortgage industry to support their argument that a large award may have been difficult to satisfy if Plaintiffs had prevailed at trial. (Pls' Atty. Brief at 5-6). Since this danger is entirely speculative, this factor does not weigh for or against Plaintiffs' request for attorney's fees.

vi. *The amount of time devoted to the case by plaintiffs' counsel*

In their brief, Plaintiffs' write that "class counsel devoted over 1400 hours in this case... [t]his results in fees of less than $150 per hour." (Pls' Atty. Brief at 6). The Court is unable to verify this claim since Plaintiffs have not submitted a summary of counsel's billed hours for this matter, only a summary of the expenses incurred. (Pls' Atty. Brief Ex. A, Ex. B). The cost estimates submitted by Touhy, Touhy Buehler & Williams are also uninformative since the descriptions of a majority of the line items are either blank or simply refer to an invoice number. Nonetheless, the Court has no reason to doubt the veracity of counsel's estimation of an average hourly rate of $150 for the work required to secure the Settlement. Counsel's devotion of considerable time to this matter weighs in favor of the approval of attorney's fees.

vii. *The awards in similar cases*

-24-

**NOT FOR PUBLICATION**

This seventh and final <u>Gunter</u> factor involves a comparison of the fee request with

attorneys' fees awarded in similar cases. Attorneys' fees of 30% are common in this Circuit. <u>See</u>

<u>In re Rite Aid</u>, 55 F.3d at 822 (review of 289 settlements demonstrates "average attorney's fee

percentage [of] 31.71%" with a median value that "turns out to be one-third"); <u>General Motors</u>,

55 F.3d at 822. Attorneys' fees of approximately 30 percent of the common fund are also

regularly awarded in labor and employment class actions. <u>See</u> <u>In re Safety Components, Inc. Sec.</u>

<u>Litig.</u>, 166 F Supp. 2d 72, 102 (D.N.J. 2001) (granting award of 33 1/3 % in common fund case

and citing to ten cases from this Circuit holding the same); <u>see also</u> <u>Erie County Retirees Assoc.</u>

<u>v. County of Erie, Pennsylvania</u>, 192 F. Supp. 2d 369, 382-83 (W.D. Pa. 2002) (38% of common

fund was awarded in ADEA case). The percentage requested by Plaintiffs (21%) is reasonable

when compared to fee awards in other cases.

viii. *Lodestar cross-check*

The Third Circuit has suggested it is sensible for a court to use a second method to cross-

check its initial fee calculation. <u>See</u> <u>In re Rite Aid</u>, 396 F.3d at 300. However, the "lodestar

cross-check does not trump the primary reliance on the percentage of common fund method." <u>Id.</u>;

<u>see</u> <u>In re Cendant</u>, 264 F.3d at 285 ("The lodestar cross-check, however, is very time consuming.

Thus, while the Court should in the first instance test the presumption, if challenged, by the

*Gunter* factors, it may, if necessary, utilize the lodestar cross-check."). To apply the lodestar

method, the Court must examine the number of hours Plaintiffs' counsel worked and the rate for

these lawyers' services, and multiply the number of hours worked by the hourly rate. The Court

can also multiply the hourly rate by a lodestar multiplier to reflect the risks of nonpayment facing

NOT FOR PUBLICATION

counsel. Prudential II, 148 F.3d at 340-41. According to their submissions, counsel spent 1,950 hours on the litigation, and had an average mixed hourly rate of $350. (Pls' Atty. Brief Ex. A). This results in a lodestar of approximately $683,500. Given the fee counsel has requested, the multiplier under the Cendant Prides formula is 1. See In Re Cendant PRIDES, 243 F.3d 722.

In In Re Cendant PRIDES, the Third Circuit ruled that a multiplier of 3 was an appropriate ceiling. 243 F.3d at 742. In Prudential II, the Third Circuit noted, based on a review of common fund cases, "[m]ultipliers ranging from one to four are frequently awarded in common fund cases, when the lodestar method is applied." 148 F.3d at 341. Accordingly, the Court finds that the requested fee of $250,000 is reasonable when measured by the lodestar cross-check.

ix. *Expenses*

In addition to their request for attorneys' fees, Plaintiffs' counsel seeks reimbursement of costs and expenses. This request is a portion of the total $250,000 requested by Plaintiffs' counsel, resulting in a breakdown of $205,100.29 for attorney's fees and $44,899.71 for expenses. In common fund cases, counsel is "entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case." In re Cendant, 232 F. Supp. 2d at 343. The scope of reimbursable expenses is broad. See Oh v. AT & T Corp., 225 F.R.D. 142, 154 (D.N.J. 2004) (finding expenses such as "(1) travel and lodging, (2) local meetings and transportation, (3) depositions, (4) photocopies, (5) messengers and express service, (6) telephone and fax, (7) Lexis/Westlaw legal research, (8) filing, court and witness fees, (9) overtime and temp work, (10) postage, (11) the cost of hiring a

-26-

**NOT FOR PUBLICATION**

mediator, and (12) NJ Client Protection Fund pro hac vice." to be reasonable). As noted, while

the summary of expenses attached to the affidavit's filed by Plaintiffs in support of their request

for expenses does not provide considerable detail it is sufficient to satisfy the Court that the

expenses requested by Plaintiffs' counsel are reasonable.

**D. Incentive Award**

Numerous courts have recognized the authority to award compensation to named

plaintiffs in class action litigation. See, e.g., Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 145

(E.D. Pa. 2000) ("[C]ourts routinely approve incentive awards to compensate named plaintiffs

for the services they provided and the risks they incurred during the course of the class action

litigation." (quoting In re S. Ohio Corr. Facility, 175 F.R.D. 270, 272 (S.D. Ohio 1997))). The

incentive awards requested here are to reward the individually-named plaintiffs for their initiative

in filing the state and federal claims that were eventually consolidated into the Settlement.

According to Plaintiffs' brief, Plaintiff Chemi is singled out for the highest reward ($5,000.00)

for "taking the lead in this litigation" and being "extremely active in this case." (Pls' Brief at 20).

Mr. Gagliardi and Ms. Intile are to be awarded $3,000.00 each for "providing counsel with

documents and information during discovery" and making themselves available for depositions.

(Id.) Messrs. Lauretti, Moody and Crockett are to be awarded $1,000.00 each for filing initial

state claims in New York, Massachusetts and Maryland, respectively, and agreed to consolidate

their claims into the Settlement. The Court finds these incentive award's to be reasonable in light

of the considerable time that the lead Plaintiffs invested in the outcome of the Settlement.

**CONCLUSION**

-27-

**NOT FOR PUBLICATION**

When considered under the various factors discussed above, the evidence presented by

Plaintiffs weighs in favor of final approval of the Settlement. The Court **GRANTS** Plaintiffs'

request for final approval of the Settlement and the request for attorney's fees and costs.

26 MAy 2009

United States Senior District Judge

-28-